## William Smith v. The State.

### No. 13. Decided December 15, 1909.

**1.—Murder—Evidence—Attorney and Client.**

Where, upon trial for murder, the evidence showed that the difficulty arose from a controversy as to the right of possession of certain premises, testimony with reference to a conference between the father of deceased and his attorney, as to his right to hold possession of the premises, should have been excluded.

**2.—Same—Charge of Court—Requested Instruction—Self-Defense.**

Where, upon trial for murder, the evidence showed that the difficulty arose as to the right of possession of a certain barn which defendant had purchased from the city, and which was in possession, at the time of the purchase, of deceased's father, and that, while defendant and said father were engaged in a wordy altercation as to such right, deceased appeared with a gun, and, according to defendant's testimony, fired at the latter, whereupon defendant shot and killed him, it was reversible error to refuse a requested instruction which submitted this phase of the case and instructed the jury to acquit the defendant if, from his standpoint, the deceased was about to make a deadly attack on the defendant, deceased having no right to the possession of the barn and not acting in defense of his father's life.

**3.—Same—Charge of Court—Self-Defense.**

Upon trial for murder, a requested charge that, if defendant had the right to fire the first shot, he had the right to continue shooting until danger to his life had ceased, should have been given under the facts.

**4.—Same—Charge of Court—Self-Defense—Means Used.**

Where, upon trial for murder, the evidence showed that the deceased had a gun, and was making an attack on the defendant, the court should have charged the jury that, if the weapon used by the deceased, and the manner of its use, was such as would reasonably be calculated to produce death or serious bodily harm, that the law presumes that the deceased so intended. Following Renow v. State, 56 Texas Crim. Rep., 343.

**5.—Same—Charge of Court—Theory of the Case.**

Where, upon trial for murder, the charge of the court was so framed that it did not properly present the true theory of the case, inasmuch as the evidence showed that the deceased had no right of possession to the property in question about which the controversy arose between defendant and the father of the deceased, and the court's charge so presented the case to the jury as though the father of the deceased had been killed, the same was error.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*N. B. Williams* and *O. H. Cross,* for appellant.—On question of admitting testimony as to advice of counsel to father of the deceased: Heironimus v. Duncan, 11 Texas Civ. App., 610; Bonner v. Wiggins, 52 Texas, 125. On question of defendant's right of self-defense: Milrainey v. State, 33 Texas Crim. Rep., 577; Meuly v. State, 26 Texas Crim. App., 274; Thumm v. State, 24 Texas Crim. App., 667; and cases cited in the opinion. On question of defendant's right to

continue shooting as long as there was danger to his person: Sargent v. State, 35 Texas Crim. Rep., 325.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Appellant was convicted of manslaughter, his punishment being assessed at two years confinement in the penitentiary.

The deceased was named Jim Smith. Father of deceased was A. P. Smith. The city of Waco owned a block of land about 300 feet square in the suburb of said city known as Edgefield. There was a brick residence on the block of land. There was also a barn situated on a different portion of the block. A. P. Smith had been renting this property from the city of Waco for some time, both the residence and the barn. Several months before the homicide the city of Waco sold the barn in question to appellant. A. P. Smith continued to rent the dwelling house and occupied it after appellant purchased the barn. When appellant bought the property, the city, through its proper authorities, notified A. P. Smith of the sale, and informed him that he must vacate it. By an agreement between A. P. Smith, the mayor of Waco, and appellant, Smith was given ten days from the date of the agreement about the sale in which to vacate, and appellant was, by the city, allowed three or four months in which to remove the barn from the property, and it was agreed by all parties that appellant should have the right of ingress and egress for that purpose. About two months after A. P. Smith had agreed appellant should have possession, appellant undertook to remove the barn. The evening before the homicide appellant went to the house occupied by Smith on the same block to see him in reference to removing the barn, but Smith was absent. Appellant interviewed Mrs. A. P. Smith and obtained from her consent to go in and tear down the barn and remove it. Appellant took his son and another workman and put them to work tearing down the barn immediately after seeing Mrs. Smith. The following morning, prior to the tragedy, appellant sent his workmen back to the barn to finish tearing it down. They had left their tools in the barn the night before so they would be convenient to their work the following day. Appellant himself went in his wagon over in what is known as East Waco, about two miles from the place of the killing, to work on another house. Appellant's son and one of the workmen went to the barn preparatory to going to work, and were getting their tools for that purpose when A. P. Smith and the deceased, Jim Smith, came to the barn and forbade them tearing it down, and used rather vigorous language, A. P. Smith remarking that if anyone tore the barn down he would either be killed or carried out feet foremost or that he would tear it down over his, Smith's, dead body. Deceased

was present and ordered them away, and perhaps used some profane language toward appellant's son, even threatening to whip him if he were not a boy. Deceased was a grown man, some 28 or 30 years of age, and had just returned from the Philippines where he had been serving in the United States army for several years. Appellant's workmen left and after they had gone about six blocks met another workman who was enroute to join them to assist in tearing down the barn, who, after being informed of what happened, returned. Information was conveyed to appellant of what had transpired. He got in his wagon and started towards the barn; at the city hall he saw the mayor and city attorney and informed them of what happened and wanted to know what he should do. They advised him that the city had nothing to do with it, that the barn belonged to him, and that he had a right to remove it inasmuch as he had gained a peaceful possession of the barn the evening before and commenced work on it; that under the circumstances A. P. Smith could not retake possession of the barn without his consent, and they could not eject him; that he had a right to continue his work upon the barn, and A. P. Smith had no right to stop him. Appellant left the city hall and went to a pawn shop where his shotgun was, got it, thence he went another block to a gunshop and bought a box of cartridges loaded with small shot, and six loads of buckshot. He got in his wagon and went in the direction of the barn. While enroute to the barn, about five or six blocks from it, he met deceased who informed him that they had run his workmen away from the barn. Appellant told deceased that he knew it and was going to tear the barn down, and drove off in the direction of the barn. This was the first time appellant had ever seen the deceased, and was not aware of the fact that he was the son of A. P. Smith or that A. P. Smith had a son. Appellant and one of the workmen, who was in the wagon with him, went on towards the barn, their horses being in a trot. They traveled along the street south of the residence; that is, the street which was at its back, to the southeast corner of the block and turned up the street along the northeast line to the barn. They passed the barn as well as the gate at the northeast corner of the barn five or six steps, stopping with the back of the wagon about five or six steps from the gate. Appellant got out of the wagon with his gun in his hand, opened the gate, and stepped inside, when A. P. Smith came up and forbade him entering the premises. There is a conflict of evidence as to whether appellant had gotten inside the gate or was on the outside when A. P. Smith came up. Smith testified that appellant had not opened the gate when he came up and forbade his entrance. Appellant's testimony was that he had already opened the gate and was on the inside of it when A. P. Smith spoke to him. James, the workman who was with appellant at the time, corroborates appel-

lant's testimony. A. P. Smith was standing on the back gallery of his residence when they passed along the street in the wagon, and was about eighty yards from the barn. Smith went from the gallery to the middle of the west side of the barn, and appellant and James went along the northeast side of the barn. They, therefore, could not see A. P. Smith as the barn was between them. They were, therefore, not aware of his presence until he came around the corner of the barn, the barn being about sixty feet wide, and it was also about sixty feet from the gate to the corner around which A. P. Smith came. When appellant opened the gate A. P. Smith said to him that he had received no written notice to vacate the barn and that he could not tear it down. Appellant replied that it was his property, that he had already commenced to tear it down; that the city authorities had told him that he had a right to tear it down, and he was going to do so. A. P. Smith testified that about this time appellant raised his gun to a shooting position at the northeast corner of the barn on the outside of the gate and laid the gun up along the northwest end of the barn. Appellant testified that he told A. P. Smith about his right to tear down the barn, that he did not want any trouble, and there was not going to be any trouble. As A. P. Smith stepped back some few steps towards an old well, just at this juncture there was a report of a gun. When the report was heard appellant glanced around or towards the northwest corner of the barn and someone with a winchester rifle in his hand raised same to his shoulder in a shooting position, with his hat pulled down over his forehead and shot at him, and he immediately returned the fire. That it did not appear to him that his first shot had hit the man and he shot the second time, whereupon the man who had fired at him stepped back, and at the third shot fell towards the corner of the barn where there was a mud hole. Appellant said he did not know at the time whom he had shot, and did not know it was the same man whom he had seen and talked with down the street before reaching the barn, nor did he know it was the son of A. P. Smith, and James testified he thought it was a negro. That he had a dark complexion, and his hat was pulled down, and the events transpired so rapidly he did not have time to distinguish who it was. Deceased fell about ten feet from the northwest corner of the barn. The evidence is in conflict as to who fired the first shot. A. P. Smith testified that appellant shot first, and that he did not know that his son was there until appellant had shot him. The gun deceased had was a large bore army gun. There seems to have been four distinct reports, and there was an empty cartridge in the gun of deceased. James testified, in substance, that A. P. Smith was between appellant and the old well, and the first he saw of the deceased was when he jumped around the corner of the barn at or near the mud hole with his winchester in a shooting position and fired. He testifies to

the conversation between appellant and A. P. Smith, and further that the rifle shot was the first that was fired, but did not know exactly how many shots were fired, that they were fired in such rapid succession. That immediately upon the cessation of the shooting he asked appellant if he was hurt. Appellant told him he was, that he was shot in the side, and that he felt something burning in the front of the lower part of his stomach. Appellant testified as did James. They then got in the wagon and went back towards town, and met an officer and surrendered. The jailer examined appellant and found a slight wound or glancing appearance of a wound on the front of his stomach just below the navel, but it did not penetrate the skin very deeply. That he thought it had been done by a ball as there was a corresponding hole in defendant's jumper, overshirt and undershirt, which looked like it had been done by a rifle or a pistol shot. He also examined appellant's left side and found under the left arm about six inches below the arm pit and back of the left breast another wound which was fresh and bleeding, and thought it was a gun shot wound. There is quite a lot of testimony, however, in reference to the wounds on appellant, some of which indicate that the wound under the arm may have been made by a split ball, and there is testimony showing that on the fence and gate, as well as the side of the barn, were staples and nails which the ball could have struck splitting it. However that may be, these wounds were on the body of appellant, whatever may have produced them. There is considerable conflict in the testimony as to the number of shots, ranging from four to six and which fired first, the rifle or shotgun. Some of the witnesses testified that one was from a rifle and three from a shotgun, and some testimony shows that two of them were distinctly shotgun reports and two of them were rifle or pistol reports. This is a sufficient statement of the facts to review the questions presented for discussion.

1. There are two bills of exception in the record which under the view taken of the case it may not be necessary to discuss, as they may not arise upon another trial, and this statement is justified by the qualification of the trial judge to the two bills to the effect that after he had admitted the testimony he concluded that the ruling was wrong, and withdrew it from the jury with instruction that they should not consider it for any purpose. These matters will not arise upon another trial.

2. There is another question perhaps well enough to notice. It is urged that the court permitted A. P. Smith to testify that he had conferred with an attorney as to his right to hold possession of the barn until he had been given written notice, and that said attorney had advised him that he had a right to have written notice before he could be dispossessed of the premises, and that without said written notice he had the right to remain in possession of the premises

against appellant. We think this was a matter that could not be used against appellant. The matter occurred between A. P. Smith and his attorney. It could in nowise affect appellant, and under the circumstances ought not to have been admitted.

3. Appellant asked the following instruction, which was refused: "You are further instructed as a part of the law in this case that if you believe from the evidence beyond a reasonable doubt that the said A. P. Smith was in possession of the barn about which the killing took place and that the defendant was trying to dispossess the said A. P. Smith or was interfering with the said A. P. Smith's possession of said barn, then and in that event you are charged that the deceased Jim Smith would have no right to assault the defendant Will Smith with a deadly weapon or kill the defendant unless the life or person of the said A. P. Smith was in peril by reason of the attack, if any, of the defendant Will Smith, and if you find from the evidence that the said Jim Smith did make an attack upon the said Will Smith with a deadly weapon, or that defendant believing that the said Jim Smith was about to make a deadly attack upon him then and in that event you are charged that the defendant had a right to protect himself from such deadly assault, if any, by shooting the said Jim Smith. And in this connection you are instructed to view the action of the defendant from his standpoint and as it reasonably appeared to him. And you are further instructed if you have a reasonable doubt as to whether Jim Smith was making an attack with a deadly weapon upon the defendant and not in defense of A. P. Smith as above set out or was about to make such an attack, then you are charged that defendant would be entitled to the doubt, and you will find as charged above, and find defendant not guilty." This charge should have been given. As before stated, appellant owned the barn, and had bought it from the city of Waco. A. P. Smith had agreed to surrender the property to appellant within ten days from a certain conversation, which has heretofore been alluded to, which time had long since expired. Jim Smith was the son of A. P. Smith, was a grown man some 28 or 30 years of age, and had no interest in the barn or its possession in any manner. Jim Smith had come hurriedly from town, got his winchester at the house, and came down to the barn where his father and appellant were. When he came upon the scene A. P. Smith's testimony indicates that appellant had his gun in a semi-state of readiness to use. This was denied by appellant, making a square issue in regard to the condition of the parties when deceased came upon the scene from around the corner of the barn. Appellant's testimony shows from himself and James that deceased came around the house with his gun in a shooting position and immediately fired, and that appellant returned the fire. Under this state of case this charge should have been given. Deceased was in no way legally connected with or had any

authority in reference to the possession of the barn.  He was a third party, and even had he interferred he would only be justified, under the terms of article 677 of the Penal Code, in shooting in case it was necessary to save his father's life.  He would, therefore, not be authorized to make an assault upon appellant under any other circumstances than that to save his father's life.  His rights and his father's were not the same in reference to the possession of the barn; in fact, deceased had no claim or possession of the property.  Under those circumstances appellant had a right to shoot from his standpoint and slay the deceased.  See White's Annotated Penal Code, articles 677 and 680.

4.  A requested instruction was refused by the court also to the effect that if appellant had the right to fire the first shot, he had the right to continue shooting until danger to his life had ceased.  This phase of the law was called for by the facts, and should have been given.

5.  Error is urged in the charge given in that the court failed to instruct the law of self-defense to the effect that if deceased was armed at the time he was killed and was making an attack on defendant, and the weapon used by him and the manner of its use was such as that it would reasonably be calculated to produce death or serious bodily harm, then the law would presume that deceased intended to murder or inflict serious bodily injury upon defendant, and if under such circumstances appellant killed deceased he would be justified.  This is the substance of article 676 of the Penal Code, and should have been given in charge to the jury.  Kendall v. State, 8 Texas Crim. App., 569; Jones v. State, 17 Texas Crim. App., 602; King v. State, 13 Texas Crim. App., 277; Renow v. State, 120 S. W. Rep., 174.

There are other questions raised on the charge which we deem unnecessary to discuss in the light of what has been said, as the trial court will understand from what is said the view this court entertains in regard to those charges.  However, before closing we desire to say that the charge given by the court does not present the case as we think it should have done.  These matters may be stated in a general way without going into detail.  This case seems to have been tried as if A. P. Smith and not Jim Smith had been killed.  There was an issue as to whether A. P. Smith or defendant was in possession of the barn, at least there was testimony upon which the court predicated the charge for conviction that Smith had the right to hold the property as against appellant.  Jim Smith, deceased, had no connection with the possession of the barn, and no right or interest in it.  If his father was in possession of the property, and appellant was about to slay him, then, if his father was in the right, to save that father's life, deceased could shoot, but if his father was trying to drive appellant away from his, appellant's, possession of the

property, and was in the wrong, then deceased was clearly in the wrong in shooting at or attempting to shoot appellant and appellant had the right to kill without reference to possession of the barn. Deceased had no right to the barn. Any controversy that might come up between A. P. Smith and appellant in reference to possession could not apply to deceased. This is made so by the terms of article 677 of the Penal Code, which reads as follows: "Homicide is justifiable also in the protection of the person or property against any other unlawful and violent attack besides those mentioned in the preceding article, and in such cases all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack, and any person interfering in such case in behalf of the party about to be injured is not justifiable in killing the aggressor, unless the life or person of the injured party is in peril by reason of such attack upon his property." Deceased could only claim that if his father had the possession of the property and appellant was in the act of shooting him, he could kill not to protect his right in the property, but to protect his life from the assault or threatened assault of appellant. Had A. P. Smith been shot and killed, a different question would have here presented itself. Appellant, however, was not charged with killing A. P. Smith; in fact, A. P. Smith was not shot, nor did appellant shoot at him. Appellant can not be tried from the standpoint of the Smiths, either A. P. or the deceased, but must be tried from his standpoint, and under this view of it, deceased had no right in the property, either the title or possession. About this there was no question at all. We make these remarks in a general way. The charge of the court seems to have been given the jury largely upon the theory that appellant was trying to obtain possession of the property by force, and that A. P. Smith was in actual peaceful possession of the property, and that deceased had the right to defend the possession.

For the errors indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*