WM. SMITH v. THE STATE.

No. 1565.   Decided May 29, 1912.

1.—Murder—Continuance—Improbability of Attendance.

Where, upon trial of murder, it appeared from defendant's third application for continuance that there did not seem to be any probability of securing the attendance of the absent witness, even though the case had been postponed or continued, there was no error in overruling the application.

2.—Same—Evidence—Constitutional Law—Confronting Witnesses.

The constitutional provision that a defendant is entitled to be confronted with the witnesses against him does not apply when the witness who has testified is dead, beyond the jurisdiction of the court, insane or is kept away by the wrongful acts of the defendant, in this event the testimony of such witness can be reproduced. Following Robertson v. State, 63 Texas Crim. Rep., 216; but it is the defendant alone who can raise the question of admissibility of testimony on this constitutional ground.

3.—Same—Evidence—Dispositions—Stenographic Notes.

The use of the word "deposition" as used in our code has the same meaning as is given that word by the common law, and embraces testimony of a witness at a former trial of the case, and includes stenographic notes in a proper case.

4.—Same—Evidence—Stenographer's Record—Reproduction of Testimony.

Where, upon trial of murder, the defendant showed that the absent witness could not be procured by due efforts made to procure his attendance, and that he was probably beyond the jurisdiction of the court, and the court overruled his application for a postponement or a continuance of the case, whereupon the defendant offered in evidence the stenographer's record of the testimony of the said absent witness at a previous trial which had been approved by the court and the counsel of both parties, and which was material to the defense, the same was admissible in evidence within the rules of law admitting the testimony or deposition of an absent witness; there being no constitutional inhibition to do so, and due diligence having been used to secure the attendance of said witness.

Vol. LXVI Crim.—38.

**5.—Same—Rules of Evidence—Absent Witness' Testimony.**

The courts are organized for the purpose of arriving at the truth of any and all controverted issues, and the rules of evidence are and should be so construed as to accomplish that purpose, keeping in view always that the best evidence obtainable must be adduced; and where a witness who had testified under the sanction of an oath and was subject to cross-examination, has moved away permanently, and his whereabouts can not be ascertained after diligent search and inquiry such testimony is admissible upon a subsequent trial in behalf of the defendant.

**6.—Same—Evidence—Bias of Witness.**

Upon trial of murder the father of the deceased should have been required to answer that since the killing of his son he had attempted to shoot defendant, the witness not claiming his exemption to incriminate himself.

**7.—Same—Charge of Court—Self-Defense.**

Where, upon trial of murder, the evidence did not show that the father of the deceased did any act or was guilty of any conduct at the time of the shooting which could or would lead defendant to believe his life was in danger, it was unnecessary in the court's charge on self-defense to submit this matter further than it was done.

**8.—Same—Charge of Court—Right of Possession.**

Where, upon trial for murder, the evidence showed that the defendant was not in actual possession of the barn about which the difficulty arose, there was no error in the court's failure to submit defendant's right to defend his possession of said barn, although defendant may have believed he was entitled to such possession, yet he could not legally take such possession by force.

**9.—Same—Right of Self-Defense.**

See opinion for a state of facts which would not deprive defendant of the right to defend against an attack on him by the deceased.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of manslaughter, penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*N. B. Williams,* for appellant.—On the question of possession of property: McGlothlin v. State, 53 S. W. Rep., 870; Smith v. State, 123 S. W. Rep., 698; Busby v. State, 51 Texas Crim. Rep., 289; Patrick v. State, 45 Texas Crim. Rep., 587; Branch Criminal Law, sections 456, 458.

On the question of the court's charge on self-defense: Duke v. State, 153 S. W. Rep., 432; Payton v. State, 132 S. W. Rep., 130; Branch Crim. Law, section 450.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, Judge.—This is the second appeal in this case, the opinion on the former appeal being found in 57 Texas Crim. Rep., 455, 123 S. W., 698. On this trial appellant was found guilty of manslaughter, and his punishment assessed at two years confinement in the State penitentiary.

The evidence is so fully stated in the decision on the former appeal, in view of the disposition of the case we do not deem it necessary to restate it here, although it varies in some particulars.

1. The first question raised is that the court erred in overruling appellant's third application for a continuance, based on the absence of A. D. James, who testified on the former trial of this case. Appellant's plea was that the killing was in necessary self-defense, and that deceased had fired on him just prior to the time he shot and killed him. On this point on the former trial the witness James testified:

"We drove up to the barn, and Will Smith jumped off the wagon and A. P. Smith was there at the gate, and when Will started to go in the gate A. P. Smith forbid him to do so, but Will opened the gate and swung it open, and said he was going to take the barn down. A. P. Smith still forbid him to come in and told him he had no right to come in there and tear that barn down, that he had seen a lawyer about it, and Will Smith said he didn't care if he had seen a lawyer about it he was going to tear it down. He swung the gate wide open and started to go in, and A. P. Smith told him he had better not come in there, that if he did he would get killed, and Will Smith said he was going to take that barn down if he did get killed, and A. P. Smith commenced to walk back. I don't know that he stayed there at all. He walked up to Will Smith to try and persuade him to go back or force him. I think he told Will, that there was a man around there, and he might kill him if he came in, and Will Smith said he was going in and did go in, and was standing there talking to A. P. Smith. I don't know that that is all that was said, but I remember that. The first thing I saw was a man at the corner of the barn, standing with a gun to his shoulder and he shot. They shot almost instantly together, and then Will Smith shot him just as quick as he could get his gun to his shoulder. The other man shot at Will Smith first.

"I can't tell how many shots were fired in all. I know Will Smith fired three, and I know the other fellow fired one, and it might have been more. I suppose he did fire more than one—I know he shot once. I saw Jim Smith when he fell; he was in the act of attempting to shoot or shooting, I can't tell which."

Appellant testified that he did not know deceased at the time he killed him, and did not know who he was when he shot him; that he was talking to A. P. Smith about tearing down the barn, when some one jumped from around the corner of the barn and fired, shooting him under the arm. A. P. Smith testified that deceased did not shoot, and thus the issue was sharply drawn between the State's witness A. P. Smith and appellant in his testimony, and the record shows that the witness James was the only other eyewitness to the entire transaction. Had appellant killed A. P. Smith, his rights in the premises would stand upon an entirely different footing

under all the evidence in the case. But if he did not know deceased, and while he was talking to A. P. Smith, a person to him unknown should spring from behind the barn and fire on him, his right to defend against such an attack would in no wise be impaired, even though his conduct might have impaired his right if he had killed A. P. Smith. To secure the attendance of this witness James, it was shown appellant had had process issued to a number of places, all being returned, witness not found. On the trial appellant testified: "I have tried every way that is imaginable to procure the attendance of James as a witness on this trial. The last I heard of him he was at Red River, and he was crossing. I have advertised in the Galveston News and Dallas News, both daily and weekly. He was what is known as an apostolic preacher. There are a good many people of that faith in the State, but they are badly scattered. There are more in Houston than any where else. I have made an effort through the people of that faith to find out where he is. I attended a meeting for that purpose. I can not find him at all." Upon this showing we do not think the court erred in overruling this, the third application for a continuance, for under it there does not seem to be any probability of securing the attendance of this witness, even though the case had been postponed or continued. While it is always to be regretted that a person on trial for his life or liberty is deprived of the attendance of a witness desired, yet if from the evidence there does not seem to be a probability that the witness can be secured by a postponement, no good or useful purpose would be subserved in postponing the case, and the State can not be deprived of the right to try a man because it is impossible to secure the attendance of a witness desired. Therefore, the court did not err in overruling the application for a continuance.

On the trial of the case, after his application had been overruled, appellant made the above recited proof as to his efforts to locate the witness and secure his attendance on the trial, and then introduced Mr. N. B. Williams, who testified that the witness James had testified as a witness on the former trial of the case and the testimony of the witness James on the former trial was offered in evidence by appellant. The bill recites:

"That the defendant having shown by his own testimony that he had made a diligent search and inquiry for the last two years throughout the confines of the State of Texas for the witness A. D. James, and had advertised for said witness in the Dallas and Galveston News, daily papers, and in the Dallas Semi-Weekly News, for a period of about ten days or more, and had made inquiry from the particular religious sect throughout Texas that the A. D. James belonged to, trying to locate the said witness, and after the defendant had learned that the family of the wife of the witness A. D. James lived in Tennessee, and after the defendant had testified that the last he heard of said witness was about eighteen months or two years ago at

a wash-out bridge on the Red River, at which time said witness was going north, and after the defendant had proven by N. B. Williams, who was present and heard the said witness, A. D. James, testify at a previous trial of this case, the defendant offered in evidence the stenographer's record of the testimony of the witness A. D. James, in which stenographer's report he is called L. V. James by mistake and after the witness had testified that said stenographer's report was substantially the evidence given by the witness A. D. James on the trial of said cause at said previous term, which said testimony of said witness A. D. James so offered by the defendant had been approved by the court and State's attorney and the defendant as a true record of the testimony of said witness at a previous trial and was used as the record of said witnesses' testimony at said previous trial on appeal, which said testimony is as follows, to wit":

In the bill follows a full statement of the testimony of the witness on the former trial, but we do not deem it necessary to set it out here. To the introduction of this testimony the State objected, which objection was sustained by the court, and to this action of the court the appellant presents his bill of exceptions, and complains of it in his second ground of his motion for a new trial. The materiality of the testimony can not be questioned, the only matter necessary to be discussed is, does the evidence bring the matter within the rules of law admitting the testimony or depositions of an absent witness? It is insisted that the court did not err, because of the constitutional provision that provides a defendant is entitled to be confronted with the witness against him, and we can engraft no exception on that provision. It is true that testimony of an absent witness can only be admitted under the circumstances authorized under a proper construction of that provision of the Constitution. In the Robertson case, 63 Texas Crim. Rep., 216, 142 S. W. Rep., 533, we discussed at length when testimony or depositions of a witness, not in attendance on court, may be introduced, and it is shown under the rules of construction prevailing in these states and countries from which this provision of the Constitution was taken, or borrowed, when the witness is dead, is beyond the jurisdiction of the court, is insane, or is kept away by the wrongful acts of a defendant, this character of testimony will be admitted upon a sufficient showing. The testimony introduced does not perhaps measure up to the standard of proof required to prove that the witness is beyond the jurisdiction, for by it it is only shown that the witness had disappeared and can not be found after diligent search and inquiry. It is true, perhaps, that a strong inference is raised that the witness is beyond the confines of the State, the proof showing that the last time he was heard from he was at Red River attempting to cross it, and we judicially know that Red River is on the northern boundary of the State, but if the evidence was offered on behalf of the State it would perhaps be required to be shown that he had actually crossed the river. In

Mr. Underhill's work on criminal evidence the question of the admissibility of evidence in the absence of a witness is discussed in secs. 260 to 267 inclusive, citing many authorities, and the rule is announced:

"The main reasons for the rejection of hearsay evidence are the absence of a judicial oath and of an opportunity for the cross-examination of the person who is the informant of the witness.

"Where a witness who has given testimony in any judicial proceeding, civil or criminal, can not be produced at a subsequent trial of the same matter between the same parties, there can be no objections on such grounds to receiving his sworn testimony at the former trial, if the absence of the witness is not caused by the party desiring to use his evidence.

"The latter trial should be for the same offense, and the accused person should be the same as in the former. It is not material that the later trial is under another indictment, if the offense charged and the parties are identical."

In discussing his question, in Reynolds v. United States, 98 U. S., 158, the Supreme Court of the United States, in holding that the testimony given at former trial is admissible where the witness is kept away by the opposite party, among other things, says: "Such being the rule, the question becomes practically one of fact to. be settled as a preliminary to the admission of secondary evidence. In this respect it is like the preliminary question of the proof of loss of a written instrument before secondary evidence of the contents of the instrument can be admitted."

The provision of the Constitution discussed in all the cases is a right given to a defendant and was the outgrowth of practice in the remote past of hearing the evidence and trying a man in his absence, the first intelligence he receiving was that he had been condemned, and we think it is the defendant alone who can raise the question of admissibility of testimony on this constitutional ground if in this character of case it can be urged. Of course, before testimony of any character is admitted in evidence, it must be brought within the well-known rules governing the admissibility of testimony. In Sec. 267 of Underhill's work on Evidence is discussed the admissibility of stenographic notes, and the authorities are collated thereunder, and the rule adopted in this State admitting in a proper case the stenographer's reports is well nigh universal, where stenographers are provided or required by law. The question of admissibility of this character of testimony was discussed by this court in the case of Johnson v. State, 1 Texas Crim. App., 333, almost contemporaneous with the adoption of our present Constitution, and in that case it is said: "In the United States it is equally as authoritatively and conclusively settled, and the practice is the same in civil and criminal cases as to the introduction and competency of such evidence." And it is there shown and held that the use of the word "depositions" as used

in our Code had the same meaning as given that word by the common law and embraced testimony of a witness at a former trial of the case. There being no constitutional inhibition which would keep the defendant from offering the testimony of a witness adduced at a former hearing between the same parties, when the attendance of the witness can not be obtained, we must inquire if under the general rules of evidence such testimony would be admissible in the absence of constitutional inhibition.

Mr. Wharton in his Law of Evidence, secs. 177 et seq., says, in treating of the inadmissibility of secondary or hearsay evidence: "Certain marked exceptions, however, exist to this rule. Among these the following is the first that may be enumerated. What a deceased witness testified to on a former trial, between the same parties on an issue substantially the same as that in which the reproducing witness is called, may be testified to, and may be proved by, witnesses who heard the testimony of the witness. The admission of such evidence is based on the fact that the party against whom the evidence is offered, having had the power to cross-examine on the former trial, and the parties and issue being the same, the second suit is virtually a continuation of the first. . . . What a deceased witness swore to at the preliminary hearing before the committing magistrate is evidence at the trial in chief; what a deceased witness swore to on a criminal trial is evidence on a second trial for the same offense. . . . As the testimony taken in a former trial can not be read if the witness is obtainable, the question arises, what proof is requisite to establish the fact that the witness can not be obtained. . . . The rule applies to deceased parties. . . . Proof of mere disappearance of the original witness is not by itself enough to admit such testimony if by due diligence the witness' attendance could have been secured, though it is sufficient to show that the original witness is absent, and a non-resident in the State where the trial is held, being out of the jurisdiction of the court, *or otherwise unprocurable, if due efforts to procure him have been made.* It has been held enough if the witness, though technically within the jurisdiction, can not, without extraordinary inconvenience, be brought to the trial. . . .

"Answers to inquiries made on searching for the witness will be rejected as hearsay, if tendered in proof of the fact that the witness is abroad; but where the question is simply whether a diligent and unsuccessful search has been made for the witness, the better opinion is, that the answers should be received. In order to show that inquiries have been duly made at the house of the witness, his declarations as to where he lived can not be received, neither will his statement in the deposition itself that he is about to go abroad, render it unnecessary to prove that he has put his purpose in execution.

"Sickness, as has been incidentally seen, falls under the same rule. Thus in an old case, where a witness, on his journey to the place of trial, was taken so ill as to be unable to proceed, we find it recorded

that his deposition was allowed to be read; and the same liberty would apply to depositions taken in a prior case between the same parties. At the same time it should appear that the sickness is of a character imposing permanent inability, as otherwise, to adopt a criticism of Lord Ellenborough, there would be very sudden indispositions and recoveries. The rule laid down by Lord Ellenborough, that where a witness is taken ill, the party requiring his testimony should move to put off the trial, is less open to objection and abuse. It is of course, in such cases, a conflict of inconveniences; but in criminal trials, where the objection to secondary evidence of this class is peculiarly strong, it has been ruled that the deposition of a woman, who was so near her confinement as to be unable to attend a trial, could not at common law be received. It is otherwise, however, when from the nature of the illness or other infirmity no reasonable hope remains that the witness will be able to appear in court on any future occasion. Mental incapacity, from whatever cause, is a sufficient inducement."

Mr. Greenleaf lays down the rule: "In the fifth class of exceptions to the rule rejecting hearsay evidence may be included in the testimony of a deceased witness given on a former action between the same parties, though this might with propriety be considered within the rule itself. This testimony may have been given either orally in court, or in written depositions taken out of court. . . . The chief reasons for the exclusion of hearsay evidence are the want of sanction of an oath, and of an opportunity to cross-examine the witness. But where the testimony was given under oath, in a judicial proceeding, in which the adverse litigant was a party, and where he had power to cross-examine, and was legally called upon to do so, the great and ordinary test of truth being no longer wanting, the testimony so given is admitted, after the decease of the witness, in a subsequent suit between the same parties. It is also received, if the witness though not dead, is out of the jurisdiction, *or can not be found after diligent search,* or is insane, or has been summoned and kept away by the adverse party." Sec. 163.

Mr. Starkie says: "The depositions of a witness may be read, not only where it appears that the witness is actually dead, but where he is dead for all purposes of evidence, *as where diligent search for him and he can not be found;* where he resides in a place beyond the jurisdiction of the court, or where he has become a lunatic." 1 Starkie Ev. (10 Ed.), 407. See 16 Cyc., page 1096, et seq., where the same rule will be found and a long list of authorities cited.

Of course, proof must be made that diligence has been used, and if possible the attendance of the witness must be secured. But if after diligent search and inquiry he can not be located, and there is no reasonable hope of securing his attendance by a postponement of the case, we think the testimony of such a witness given at a former trial, properly proven up, would be admissible in evidence, and the

court erred in this instance in excluding the testimony. Take all the rules of evidence, and in each and every instance if the primary evidence would be admissible, and it is shown that it is lost and can not be found by diligent search, and there does not seem to be any reasonable hope of ever procuring it, then secondary evidence becomes admissible as being the best that is obtainable.

The courts are organized for the purpose of arriving at the truth of any and all controverted issues, and the rules of evidence are and should be so construed as to accomplish that purpose, keeping in view always that the best evidence obtainable must be adduced, and when we consider that a note, deed or other particle of evidence is lost or destroyed, then secondary evidence of the contents becomes admissible, in criminal as well as civil cases, the same reasoning would by analogy admit the testimony of a witness who had testified under the sanction of an oath, subject to cross-examination, who has moved away permanently, and his whereabouts could not be ascertained after the most diligent search and inquiry. Of course, temporary absence or inability to locate a witness would not be sufficient, but the absence must be shown to be permanent, and the present whereabouts or location of a witness impossible of ascertainment after diligent search and inquiry.

3. In the third bill of exceptions appellant complains that the court erred in refusing to permit him to ask the State's witness, A. P. Smith if he, since the killing of his son, had not attempted to shoot defendant. If the witness had not been prosecuted for such offense, and he should claim his privilege not to answer any question that might incriminate him, he could not be compelled to do so. But in the absence of any such exemption being claimed, the witness should have been permitted and required to answer the question. That a witness may be required and should be permitted to answer any question which would show his animosity, bias, ill-will or interest has been so recently and fully discussed in the case of Earles v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181, and Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 612, we do not deem it necessary to discuss the question here.

4. All the other assignments relate to the charge of the court. The rules of law governing in this case were so thoroughly discussed on the former appeal we do not deem it necessary to do so again at length. As appellant has been convicted of manslaughter, and can be tried for no higher grade of offense, we would say that several matters complained of in the charge present no error, and as the evidence does not show that A. P. Smith did any act or was guilty of any conduct at the time of the shooting which could or would lead appellant to believe his life was in danger, it was unnecessary to present the case as it relates to self-defense, as to the acts and conduct of A. P. Smith, except in so far as the language of A. P. Smith about going in the barn might have caused appellant, from

his standpoint, to think his life was in danger when he says he saw a man with a gun step from behind the barn. We do not think the court should have charged that appellant was in possession of the barn, and had the right to defend his possession, for appellant testified, when the officials asked him if "he was going to let them take the barn away from him," "He (A. P. Smith) has already got it," and added, "I will go and try it, and if there is a fire alarm turned in, you will know they have done something." This clearly shows that appellant did not think he then had the barn in his possession. It is true, if the evidence is to be believed, he was entitled to possession of it, but the law does not authorize one to take a shotgun and get possession of property by force, even though he be entitled to it. It has provided a lawful way to proceed, and while it may be irksome for some to follow that course, yet it must be done if one expects to justify his conduct under the law. Therefore, the court in his charge presented this phase of the case in as favorable light as the evidence called for, and there was no error in refusing the special charges presenting this issue. However, if appellant did arm himself and go where he must and probably did know there would likely be serious trouble, if he believed the threats he says were communicated to him, yet this would not deprive him of the right to defend against an attack on him by Jim Smith (whom he did not know) if one was made, or it reasonably appeared to him, in the light of the statement made, when the man came from behind the barn with a gun, that he was in danger of losing his life or suffering some serious bodily injury.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

PRENDERGAST, Judge, not sitting.