### WILL DRAKE v. THE STATE.

#### No. 1532.   Decided February 7, 1912.

**1.—Murder—Continuance—Practice on Appeal.**

Where the cause is reversed and remanded on other grounds, the overruling of the motion for continuance need not be considered.

**2.—Same—Evidence—Motive—Irrelevant Matter.**

Where, upon trial of murder, the State's testimony, in support of its theory that defendant killed deceased to marry his widow, was not sufficient in any way to support this theory, it was reversible error to admit testimony

that defendant had so conducted himself towards his former wife that she had brought suit for divorce, etc., and defendant did not contest, and was solicitious after the former wife obtained a divorce to know whether he could marry again, etc.

### 3.—Same—Evidence—Declarations of Defendant—Judgment in Civil Suit.

While, upon trial of murder, it was proper to permit the State to show that the wife of deceased brought a suit for divorce against the deceased in which the defendant was a witness for plaintiff, and that when he heard that the court had denied a divorce, made certain declarations with reference thereto, it was reversible error to admit in evidence the judgment in that suit or any of the details of that trial.

### 4.—Same—Evidence—Cross-Examination—Letters.

Where the defendant introduced as a witness the wife of the deceased to show that there was no foundation to the theory of her future marriage to the defendant, the State had the right to cross-examine her upon this matter, but had no right to go into details about her and her deceased husband's life and marriage, or the letters that had been written by her to her husband after the separation, with which the defendant had no connection.

### 5.—Same—Evidence—Dying Declarations.

Where the proper predicate had been laid, there was no error in introducing in evidence the dying declarations of deceased.

### 6.—Same—Evidence—Statement of Deceased.

Upon trial of murder, it was error to admit in evidence the declarations of the deceased after he was shot to the effect to tell his poor mother that he was going to die like a man, and that a coward shot him; as this testimony would have been inadmissible if deceased had been living.

### 7.—Same—Jury and Jury Law.

Where the record showed that the jurors were qualified to try the defendant, there was no error.

### 8.—Same—Evidence—Declarations of Defendant.

Upon trial of murder, there was no error in admitting in evidence the fact that defendant, on the day of the homicide, asked someone if he would go on his bond if he got into trouble.

### 9.—Same—Evidence—Declarations of the Defendant.

Upon trial of murder, there was no error in admitting in evidence the declarations of the defendant made some time before the homicide with reference to the deceased.

### 10.—Same—Conduct of Trial Judge—Practice—Statutes Construed.

See opinion cautioning trial judges about engaging in the interrogation of witnesses during the trial; such practice may lead to the reversal of cases, as it is calculated to convey to the jury the opinion of the trial judge of the case. Article 767, Code Criminal Procedure.

### 11.—Same—Evidence—Bill of Exceptions.

Where no bills of exception are reserved, the question of the admission or rejection of testimony can not be reviewed on appeal.

### 12.—Same—Charge of Court—Charge as a Whole.

Where the court's charge on self-defense and manslaughter are not susceptible of the criticisms against them, when considered as a whole, there was no error.

Appeal from the District Court of Eastland. Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of murder in the second degree; penalty, sixteen years imprisonment in the penitentiary.

The testimony showed that ill feeling resulted between the defendant and deceased growing out of a divorce suit by the wife of deceased against the latter; that the defendant had been witness for plaintiff in that suit and had declared, after hearing that the court refused to grant a divorce, that there was some other way in getting rid of the deceased; that on the day of the killing, some time after said divorce suit, the defendant and deceased and several other parties were riding around in buggies and were drinking wine and other liquor freely, but that all were seemingly friendly; that several times during the day the deceased expressed a desire to speak to defendant about said divorce suit, and declared that the defendant had testified to a lie during said suit; that he found opportunity at different times during the day, while they were drinking together, to speak to the defendant about this matter, and that they had some words about it, but seemingly separated every time as friends; that defendant said he wanted no trouble, and that when deceased came at different times to speak to him about it, he said that the matter was settled and that they were friends; that shortly before sundown, when defendant and another started to ride home in defendant's buggy, the deceased got into defendant's buggy again proposing that they settle that trouble and that he wanted to speak to defendant, and asked the companion of the defendant to leave the buggy, to which the defendant objected and again said that the matter was settled—that they were friends, and that then, some of the other parties present induced deceased who, as the others, was under the influence of liquor, to get out of the buggy; but that before defendant and his other companion could drive away in the buggy, the deceased again came and entered the buggy, and proposed to talk matters over again, when the following occurred, as testified to by the third party in the buggy: That just before the deceased again entered defendant's buggy he said: "He is game, and I am game; if it ain't settled, there will be a black box for one or tother of us," and that when deceased got into the buggy again, he wanted to drive off and have a talk with defendant who replied that they had already made friends and that he had to go home, saying that if deceased wanted to go home with him, it would be all right, deceased refusing to go home with him; that when they drove off and had gotten a little piece, deceased reached out and pulled up on the lines and told defendant he wanted to talk to him, and told him to talk to his (deceased) wife for him; that defendant told him he would, and said he would tell her anything he told him to tell her, and he (defendant) would tell deceased anything she said, and if she told defendant to go to the devil for him, not to get mad at him; that this angered deceased and he called the defendant "a G— D— liar," and jumped out of the buggy saying, "G— dam you, get out of here," and that then defendant shot him; that before deceased jumped out, he was sitting between witness and the defendant; that

witness could not tell what deceased was doing at the time he was shot, but that he was shot just as soon as he hit the ground.

Some of the State's witnesses testified that they were close by when the shooting occurred, and that it looked like deceased was holding up his hands or had hold of the buggy at the time he was shot, and that they saw nothing in his hands. It was also shown that the deceased was not armed at the time.

Defendant testifies in his own behalf, and his testimony was substantially the same as the eyewitness who was in the buggy at the time with the defendant and the deceased, and whom defendant introduced as a witness, with this difference, that defendant testified that when deceased jumped out of the buggy, he made demonstrations as if to draw a weapon, and that then deceased fired. The State also showed that the witness who was in the buggy with defendant and deceased had not testified on a former trial to the declarations of the deceased to the effect that both he and defendant were game, and that if the matter was not settled, that there would be a black box, etc.

This, with that contained in the opinion, is a sufficient statement of the case.

*Scott & Brelsford* and *D. G. Hunt,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was indicted, charged with murder. The court submitted the issues of murder in the first and second degree, manslaughter and self-defense, and appellant was convicted of murder in the second degree, and his punishment assessed at sixteen years confinement in the penitentiary.

1. An exception was reserved to the action of the court in overruling appellant's first application for a continuance. In view of the disposition that will be made of the case, we do not deem it necessary to discuss this assignment, as the matter will probably not arise on another trial.

2. Appellant was charged with unlawfully killing Ross Carter. Deceased had been married to Nora Scott. They lived together only a short time, and parted, her brother taking her home. Appellant had nothing to do with this separation in so far as this record discloses. Mrs. Carter brought suit for divorce, and appellant was a witness in her behalf. The record does not disclose his testimony, but it does disclose that deceased claimed that appellant had sworn a lie in that case, and said he was going to make him sign a "lie bill" or kill him. The court, in qualifying certain bills of exception, states it was the theory of the State that appellant was desirous of marrying Miss Scott, or rather deceased's wife, from whom he was parted, and that she having failed in her divorce suit, he killed deceased to get him out of the way, and on this theory he bases his action in admitting certain testimony. If

this theory has any proper basis in the testimony, it may not have been error in admitting the testimony, but if it has no substantial basis in the testimony, then the error would be apparent in admitting these extraneous matters, which will be hereinafter referred to. The only testimony offered by the State as a basis for this theory, that appellant was in love with deceased's wife and desirous of marrying her, is based on the testimony of Venus Earp, who testified: "I know defendant, and I know Mrs. Nora Carter, wife of the deceased. I have seen Drake and Nora Carter associated together at church. I don't know how many times, but not more than once or twice. That was after Ross Carter and his wife separated. I never saw them associated together at any other time, at social gatherings or other places of amusement. I never did see them in a conveyance together at any time on their way to church or other places. I don't remember seeing them in a hack but once or twice. I saw them in a hack once or twice. I was at a party at Jones Stanfield's. I saw them there together that night. They talked together a little. I saw them talking together that night, but not much." On cross-examination he testified: "These two or three times that I saw the defendant in company with Nora Carter, it is true that he was simply sitting up in the seat with other members of the family; that there was a hack load of the family going to church; he sat in the seat with her brothers, and she was in the back seat with her mother. That is what I mean when I say I saw him associated with her. Outside of that I do not pretend to say that I ever saw him keeping her company in the sense of sparking or courting her. I do not mean to say that I ever, in my life, saw Will Drake alone in her company or alone with her, that I know of."

This is all the testimony offered by the State to show intimacy between appellant and Mrs. Carter, and upon which it was attempted to build a theory that appellant had killed deceased that he might marry his (deceased's) wife. Mrs. Scott's family and brothers were farmers, as was the family of appellant, and lived in the same community, and attended the same church, and we do not think this testimony sufficient to raise the issue that appellant had killed deceased because of his love of the wife of deceased, or that he might marry her. And especially is this true in the light of the entire record. Defendant testified that he was engaged to be married to a Miss Martin at this time, and has been paying her attentions and not Mrs. Carter. Mrs. Carter testified that defendant never at any time called to see her or paid any attentions, or went with her to any entertainment. Her brother, Fred Scott, also so testified, and there was no evidence or circumstance in evidence upon which to build such theory, except the testimony of Venus Earp hereinbefore copied, and this being insufficient to make that question an issue in the case, the court erred in permitting the witness H. R. Debenport, an attorney of Howard County, to testify that he had brought suit in behalf of appellant's former wife for divorce against him. That appellant attended the trial, but made no defense,

and told the attorney he wanted her to get a divorce, and that when the decree was entered he asked the attorney if he was a free man and could marry again. Appellant was not being tried in this case for any wrong he had done his former wife, and to permit the fact that he had so conducted himself towards his former wife that she had brought suit for divorce on grounds sufficient to obtain a divorce; that he was present and did not contest the grounds, and was only solicitous to know if he was also permitted to again marry, could and would only prejudice the jury against him. The killing did not grow out of any circumstance connected with the proceedings in the District Court of Howard County, and it was error to admit this testimony in evidence. Again, it appearing that whatever ill will that existed between the two men grew out of the fact that appellant had testified in the District Court of Eastland County in a suit between Mrs. Nora Carter and her husband, it was proper to admit the fact that such suit had been tried and appellant was a witness, and that when he heard that the court had denied a divorce, any remark that he may have made, but it was error to admit over objection of defendant the judgment in that suit, or any of the details of that trial, except in so far as appellant was connected therewith. He had been summoned as a witness, and the fact that he testified that deceased claimed he had sworn a lie, and the threats of either or both of them were admissible, but none of the other details, nor the judgment entry in that case were admissible.

3. When the witness Earp had testified, at the instance of the State, as herein recited, appellant placed Mrs. Carter on the stand, and she testified: "I have been sworn. My name is Mrs. Nora Carter. I was formerly Nora Scott and I am a daughter of the widow Scott who lives down here by Okra. I am eighteen years old. I married Ross Carter on the 26th day of December, 1909. I know the defendant in this case, Will Drake. I have known him a right smart while; about four or five years. Will Drake has never gone with me and kept my company socially in his life. Will Drake has never in any manner or time or form or way been sweethearts with me or courted me or anything of that kind. I have never at any time gone, in my life, or attended parties or social gatherings of any kind, where I have been accompanied to or from them by Will Drake. There has never at any time been anything said by Will Drake to me or by me to Will Drake with reference to being sweethearts, or marrying or anything like that. I have never in my life considered him in that light at all." No other question was asked her by appellant and no other testimony sought to be elicited by him. This was material in the light of the testimony of the State witness Earp. Of course, the State should have been and was permitted to cross-examine her on this matter, but the State should not have been permitted on cross-examination to go into details about her and her deceased husband's life and marriage; the separation and letters said to have been written by her to her husband after the separation. Appellant was in no way connected therewith; it was not claimed

·he was the cause of the separation, and nothing in evidence suggests it; he was not mentioned in the letters said to have been written by her to her husband after the separation; in fact, if said letters were written, (a fact she denied) they would indicate she loved her husband and no other person; and she was being kept away from him by her family. These matters did not tend to shed any light on the killing, cause of the killing, or any other fact' which would show or tend to show whether appellant was guilty of an unlawful killing, or was ·justifiable, and should not have been admitted in evidence. The letter introduced in evidence, and the other evidence adduced on cross-examination, that her brothers sought to prevent the witness from being with her husband (the deceased) and one of her brothers had carried her away, and that her family and brothers would not let her write to her husband, etc., have ·no place in this trial, and should not have been admitted in evidence.

4. The dying declaration testified to by witness Livingston was properly admitted in evidence. It was sufficiently proven that deceased at that time knew that his death was inevitable, and was made under circumstances which authorized its introduction in evidence. It was the version of deceased of the way the shooting occurred.

5. But we do not think that the evidence of the witness S. F. Maddison should have been admitted in evidence. While it is perhaps true that at the time deceased made the statement to witness he was conscious of approaching death, yet the statement itself is inadmissible. If deceased had been living he would not have been permitted to thus testify, and his being dead would not render admissible any evidence as his testimony, which would not be admissible were he living. The witness Maddison testified: "Deceased called me to him and said, Sep, I am shot. I am going to die. Tell my poor mother that I am going to die like a man; that a coward shot me." This in no way shed light on the incidents leading up to the difficulty, the motive for, or the conduct or words of the parties before or at the time of the unfortunate difficulty. As we understand the law, a declaration made by a deceased person, to be admissible in evidence, must be such a statement as the person, if living, would be permitted to testify to, and this evidence not coming within that rule, should not have been admitted.

6. There are some other bills of exception in the record, but we do not deem it necessary to discuss them at length. The three in regard to jurors, as qualified by the court, present no error. We have held that dying declaration as testified to by the witness Livingston was admissible in evidence, and this bill presents no error.

7. The testimony of the witness Sam Williams that defendant asked him that day: "If I get into trouble will you go my bond," became admissible in the light of defendant's testimony that he carried his pistol ·that day, and at the time he got the pistol he had in mind the threat of deceased, and carried it for protection.

8. The testimony of the witness Will Carter as to what defendant

said to Fred Scott at the time he heard the court had refused Mrs. Carter a divorce, was admissible. It is true defendant and Fred Scott both denied defendant had used such language, but this was a question to be decided by the jury, and the court did not err in admitting it in evidence.

9. As hereinbefore stated, the court erred in admitting in evidence the matters complained of in bills of exception Nos. 7, 8, 11 and 12, and these bills present such errors as will cause a reversal of this case, and while the action of the court in interrogating witnesses is not complained of in a way that we would discuss it only that the case must be reversed on other grounds, we feel that perhaps in view of another trial it is perhaps better to caution trial judges about engaging in this practice and developing evidence which had not theretofore been elicited in the case. It may prevent the reversal of cases in the future. In the case of Harrell v. State, 30 Texas Crim. App., 225, it is said that this court will not reverse for such conduct unless the conduct is such as to be prejudicial to the appellant, but that such conduct is very reprehensible, adding: "Our Code of Criminal Procedure is very particular in regard to this matter. Article 767 provides: 'In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he at any stage of the proceedings previous to the return of the verdict make any remark calculated to convey to the jury his opinion of the case.' Now, in the examination of a witness, however fair minded the judge may be, it would be almost impossible for him to so conduct it as not to suggest in some measure that he is on one side or the other. And, moreover, we have noticed that, when the court attempts to thus usurp the functions of counsel, he is apt to ask questions that are leading in character, and that are otherwise objectionable. By carefully attending to his own duties and conserving his own functions, he will best be able to hold the scales of justice impartially as between the counsel who are managing the case for and against the State; and, whenever he does interfere, it is generally at the expense of his own authority and dignity, which should be rigidly guarded, in order that he may administer the law with fairness and impartiality, and with that authority and power which pertains to the office. We can not commend the action of the judge in his attempt to interfere with the province of counsel for the State in the examination of witnesses, and, if it appeared to us that such interference on his part was calculated to prejudice the rights of the appellant, we would not hesitate to reverse this case. Such interference on the part of a judge can never be called for."

10. There are some matters in regard to the evidence complained of in the motion for a new trial, to which there were no bills of excep-

tion reserved, at least none appear in the record, and, of course, these matters we can not review.

11. The criticisms of the court's charge on self-defense and manslaughter are not justified when the charge is read as a whole, but for the errors above pointed out this judgment is reversed and the cause is remanded.

*Reversed and remanded.*