THOMAS WATERS v. THE STATE.

No. 4282.   Decided December 20, 1916.

Rehearing granted February 20, 1917.

**1.—Murder—Evidence—Conclusions of Witness.**

Where, upon trial of murder, the defendant attempted to introduce testimony as to the conclusions of the witness about the deceased's behavior before the homicide, there was no error in excluding the same; besides, this matter was established by the defendant himself and other witnesses.

**2.—Same—Evidence—Immateriality of Testimony.**

Where, upon trial of murder, all the acts and sayings of both defendant and deceased on the morning of the killing were admitted in evidence, there was no error in excluding testimony as to what time the mail arrived, and the people got their mail, etc., in the town where the killing occurred.

**3.—Same—Argument of Counsel—Requested Charge.**

Where the State attorney's argument was proper and the defendant merely objected thereto without a requested charge in writing, there was no reversible error. Following Edwards v. State, 75 Texas Crim. Rep., 647.

**4.—Same—Evidence—Hearsay—Acts of Defendant.**

Where, upon trial of murder, the defendant proved by several witnesses each and every act of his in avoiding the deceased when he was about to meet him, there was no error in excluding hearsay testimony as to this matter. Following Hardeman v. State, 61 Texas Crim. Rep., 111, and other cases.

**5.—Same—Conduct of Judge—Witness Under Rule—Practice.**

Where, upon trial of murder, it developed that one of defendant's witness, who was under the rule, had been told by the defendant as to what a certain State's witness had testified to, whereupon the court reprimanded the witness, retired the jury to inquire further into the matter, and then ordered the return of the jury, and just as they were entering the courtroom, the court in their hearing, said, "Assess his fine at twenty-five dollars," and while the jury did not know who the fine was against, they supposed it was against the witness and the defendant, which was true, and in their deliberations discussed the matter, this under the facts of the instant case was reversible error, as it was calculated to impress the jury that it was done to discredit defendant and his witness. Following Scott v. State, 72 Texas Crim. Rep., 26, and other cases. Prendergast, Judge, dissenting.

**6.—Same—Jury and Jury Law—Readmitting Testimony.**

Where, after retirement of the jury, they disagreed as to the testimony of a certain State's witness and wrote out interrogatories under direction of the court to be asked said witness, one of which was what the witness did when he saw deceased, and what from his attitude he thought he was about to do, and the court in the presence of the jury stated to them that this matter was not testified to by the witness, and he would not permit that question to be answered. Held, that the court could not inhibit the witness from repeating his testimony in reply to the query of the jury. Prendergast, Judge, dissenting.

**7.—Same—Evidence—Adequate Cause—Insult to Female Relative—Motive.**

Where the facts constituting the testimony of the widow of the deceased were not communicated to the defendant before the homicide, so far as the evidence discloses, with reference to a transaction between the deceased and the defendant's son, and which was an insult to the wife of the deceased calculated to arouse the passion of the deceased, its introduction in evidence against the defendant was prejudicial to his case, and was, therefore, reversible error. Prendergast, Judge, dissenting.

**8.—Same—Self-defense—Charge of Court.**

Where, upon trial of murder, the court's charge on self-defense was given in rather a negative than a positive form, the defendant's requested charge to the effect that he had the right to have the jury informed in the charge on self-defense that if he had the right to fire the first shot, then that right continued until the danger to his life had ceased, as viewed from his standpoint of the difficulty should have been given under the facts of the instant case. Following Stanley v. State, 62 Texas Crim. Rep., 306, and other cases.

**9.—Same—Evidence—Habits of Deceased—Threats.**

Where, upon trial of murder, the question arose in connection with threats by the deceased against the defendant whether the former was in the habit of carrying his pistol in his automobile, this character of testimony was admissible under the facts of the instant case. Prendergast, Judge, dissenting.

Appeal from the District Court of Hemphill. Tried below before the Hon. Frank Willis.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Baker & Willis, Hoover & Dial,* and *H. E. Hoover,* for appellant.—
On question of conduct of trial judge: Branch's Crim. Law, sec. 363;
Hayes v. Sate, 36 Texas Crim. Rep., 146, and cases cited in opinion.

On question of exclusion of evidence showing the facts and dealings
of the parties prior to and leading up to the killing: Hill v. State,
74 Texas Crim. Rep., 481; Penton v. State, 67 Texas Crim. Rep., 448;
Gant v. State, 73 Texas Crim. Rep., 279; Barnett v. State, 76 Texas
Crim. Rep., 555; Heffington v. State, 41 Texas Crim. Rep., 315;
Campbell v. State, 15 Texas Crim. App., 506; Lamb v. State, 75 Texas
Crim. Rep., 75; Gomez v. State, 75 id., 239.

On question of argument of counsel: Kenedy v. State, 19 Texas
Crim. App., 618; Grosse v. State, 11 id., 364; Conn v. State, 11 id.,
390; Bryson v. State, 20 id., 566; Gazley v. State, 17 Texas Crim. App.,
367; Exon v. State, 33 Texas Crim. Rep., 461; Ross v. State, 61 Texas
Crim. Rep., 12.

On question of uncommunicated acts of the defendant: Brumley v.
State, 21 Texas Crim. App., 222; Miers v. State, 34 Texas Crim.
Rep., 161.

On question of court's refusal to submit requested charge of de-
fendant on his right to continue to shoot: Clark v. State, 56 Texas
Crim. Rep., 293; Smith v. State, 57 id., 455; Woodward v. State, 54
id., 86; Duke v. State, 61 id., 19; Swain v. State, 48 Texas Crim.
Rep., 98.

On question of the insufficiency of the evidence: Flynn v. State, 43
Texas Crim. Rep., 407; Spivey v. State, 45 id., 496.

*C. C. McDonald,* Assistant Attorney General, for the State.—On ques-
tion of refusing evidence that appellant avoided deceased before the
killing: Powell v. State, 5 Texas Crim. App., 234; Becker v. State,
recently decided, and cases cited in opinion.

HARPER, JUDGE.—Under an indictment therefor appellant was tried
for the murder of Phil Milam, convicted of manslaughter and assessed
the lowest punishment.

As stated by appellant's attorneys in their oral argument on submis-
sion and conceded by their briefs, all material facts as to the relations
existing at the time of the killing and for some time prior thereto and
of other facts surrounding the parties and the killing were proven and
established by uncontradicted and uncontroverted testimony, except the
facts of the immediate killing. As to the facts of the immediate kill-
ing, appellant's testimony, somewhat supported by some other wit-
nesses, would tend to show that he killed deceased in self-defense. On
the other hand, the testimony by the State's eyewitnesses, by a consid-
erable preponderance, would show that the killing was not done by
appellant in self-defense, but would show murder, or at least man-
slaughter. We may state herein, if necessary, some testimony in dis-
cussing the assigned errors.

When the trial began all the witnesses for both sides were sworn, placed under the rule and instructed by the court as usual on such occasions. C. E. Eubanks was an important witness for appellant. He and appellant were officers in the same bank, appellant being president and Eubanks cashier. In cross-examining one of the State's witnesses, appellant asked him if he had not made certain statements to said Eubanks with the view of impeaching him by Eubanks. After the State introduced its testimony and rested, appellant, among others, introduced said Eubanks, and he testified in effect impeaching said State's witness. Upon the cross-examination by the State of Eubanks, it developed that appellant had told Eubanks what said State's witness had testified, in clear violation of the court's instructions when placing witnesses under the rule. The court heard this development and himself began to ask questions, so as to ascertain definitely whether appellant had communicated to Eubanks the testimony given by said State's witnesses. Upon objections by appellant, the court retired the jury, then further investigated this question, and Eubanks swore that appellant had communicated the testimony of said State's witnesses to him. Thereupon, the court entered a fine of $25 each against appellant and Eubanks, and then directed the jury to be returned, which was done. It seems that, as the jury entered, only two of them first entering merely heard the judge tell the clerk: "Assess his fine at $25." They did not know to whom the judge referred. None of this shows any reversible error.

The uncontradicted and uncontroverted testimony, by appellant himself and by several witnesses for both sides, showed positively that a state of hostility existed between appellant and deceased, each against the other, which had existed for a considerable length of time up to the very day of the killing, and became worse after they had had a fist fight a few weeks before the killing, and that for a few months or weeks before the killing, appellant on every occasion when he and deceased were about to meet or come into the company of one another in the town where they lived and the killing occurred, went out of his way each time to avoid meeting deceased. Appellant offered to prove, upon cross-examination of one of the State's witnesses that he, the witness, had observed this conduct of the appellant on numerous occasions "because the witness was expecting trouble between appellant and deceased on such occasion." And further, that he, the witness, noted deceased's behavior on said occasions "such as indicated to his mind that deceased was seeking an opportunity to meet the appellant with an angry expression on his face." It seems by appellant's bill that these conclusions of the witness were what was objected to and sustained by the court. The action of the court was correct. Even if incidental to the objection of this testimony of the witness the court may have excluded that witness' testimony as to the conduct of appellant in avoiding deceased, it would be immaterial, because, as stated, such facts were, without controversy and clearly established by the positive testi-

mony of appellant himself and of various other witnesses on both sides, without any contradiction or contest thereof by the State. In fact, it was conclusively established that appellant. pursued that course of conduct.

The court's action in excluding the testimony of a witness, on the State's objection, as to what time the mail got into Glazier on the night trains and what time the people who got their mail at the postoffice usually went for it, was correct. This could not have been material in any way. All the acts of both appellant and deceased on the morning of the killing and what they said, where sought to be proved, were introduced and shown without any objection.

Appellant's bill complaining of the argument of the district attorney shows no error. We think the district attorney had a right in his argument to make the hypothetical inquiry that he did. (Edwards v. State, 75 Texas Crim. Rep., 647, 172 S. W. Rep., 227.) Appellant merely objected to the argument. He requested no charge in writing, or otherwise, that the jury should be instructed to disregard it.

After the jury had been out for some time, it seems they differed as to the testimony of one or two of the witnesses on a certain point, and in effect, as we understand this matter, as shown by all the proceedings with reference thereto, they wanted to have one of the witnesses testify on a point which he had not testified to on the trial. The court followed fully our statute on this subject, which is: "If the jury disagree as to the statement of any particular witness, they may, upon applying to the court, have such witness again brought upon the stand; and he shall be directed by the judge to detail his testimony to the particular point of disagreement, and no other, and he shall be further instructed to make his statement in the language used in his examination as nearly as he can" (art. 755, C. C. P.), and permitted the witness to tell what he had testified on the point inquired about, but refused to permit any witness at that time to testify on any point wherein he had not testified on the trial. We think the action of the court was correct, and that no reversible error is shown by his action in regard thereto. (See the decisions noted under said article both in the revised C. C. P. and under said article in Vernon's Ann. C. C. P.)

The court did not err in refusing to permit the witness Whitacre to testify what appellant said to him when he saw appellant turn off and come into the witness' store as to why he did so. This applies also to the same character of testimony sought from the witness Gaines. Such testimony was hearsay. As stated, appellant proved by himself and several witnesses—and no contest whatever was made thereof by the State—each and every act of his in avoiding the deceased when he was about to meet him. Becker v. State, recently decided, from Harris County, not yet reported; Giebel v. State, 28 Texas Crim. App., 151; Bradberry v. State, 22 Texas Crim. App., 273; Angus v. State, 29 Texas Crim. App., 52; Harrell v. State, 39 Texas Crim. Rep., 204;

Red v. State, 39 Texas Crim. Rep., 414; Hardeman v. State, 61 Texas Crim. Rep., 111; Underhill on Cr. Ev. (2d ed.), sec. 119a.

Appellant sought to have his witness McBride testify that deceased, after the fist fight between appellant and deceased, but some time before the killing, told him that he, deceased, always carried a gun in his car. The State objected to this because it was not shown that appellant was apprised of this before the killing, the court at the time remarking: "I do not see the materiality." The testimony of appellant himself was to the effect that deceased did not go to his car on the occasion when he killed him for the purpose of getting a pistol, or for any other purpose. He started in that direction, but only went a short distance. Appellant knew that he had not on the occasion gotten a pistol from the car, or otherwise. Under the circumstances, said testimony was inadmissible, but even if it had been admissible, the excluding of it would have been immaterial, and presented no error.

Appellant introduced testimony showing that deceased and appellant's grown son had a fight the night before the killing at a church in the town and had the witnesses detail the whole affair. After this had been done, the State introduced Mrs. Milam, who testified over his objections what was done and said by appellant's son at the time which brought about and was the cause of the fight. This was a part of the same transaction, and clearly under the statute and decisions thereunder, was admissible. (Art. 811, C. C. P.) The jury could not have understood the occasion for the fight nor the particulars thereof without having the cause thereof stated to them. Appellant himself testified that his son had told him all about it the night before and the morning of the killing, and just before the killing he had had Rev. Mr. Beck to again tell him the particulars, and it was just after all these facts were known to him that he killed deceased.

The court gave a correct charge, submitting both murder and manslaughter to the jury. As appellant was convicted of manslaughter only and acquitted of murder, murder passed out of the case. In the charge on manslaughter, the court gave a full and correct charge thereon, to which appellant made, and makes, no objection.

He, however, asked several special charges on the subject of self-defense. It is unnecessary to copy these. None of them, except the one which the court did give, should have been given. None of his specially requested charges met the requirements as has been many times and uniformly held by this court. (Byrd v. State, 69 Texas Crim. Rep., 35; Ryan v. State, 64 Texas Crim. Rep., 628.) But without regard to that, we have considered all of them.

It is always necessary in passing upon any objection to the court's charge, or those which were refused, to consider the whole charge of the court which was given, and if the whole charge on the subject presents every issue properly, then no error is committed.

On his claimed self-defense, the court in his main charge instructed the jury:

"13. A reasonable apprehension of death or serious bodily injury will excuse a person in the use of all necessary force to protect his life or his person, and it is not necessary that there should be actual danger providing he acts upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such cases the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant, or apparent assailant.

"If from the evidence you believe that at the time the defendant, Thomas Waters, killed the deceased, Phil Milam, the said Phil Milam was making, or was about to make, an attack upon the defendant, Thomas Waters, and from the manner and character of such attack the defendant had a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear the defendant shot and killed the deceased, then in such event you will find the defendant not guilty.

"14. In determining whether or not at the time the defendant shot the deceased, Phil Milam, he was in danger of losing his life or sustaining serious bodily injury, and also in determining whether or not from the facts and circumstances in the case that at the time he shot the deceased he believed that he was in danger of losing his life or sustaining serious bodily injury, and had a reasonable apprehension of such danger, you will view the transaction from the defendant's standpoint and from no other standpoint, and if you have a reasonable doubt as to such matters you will give the defendant the benefit of such doubt and say by your verdict not guilty.

"15. The defendant in a criminal case is presumed to be innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt, and if after having heard all of the evidence as applied to the court's charge you have reasonable doubt of his guilt you will acquit him."

And in addition gave this charge requested by appellant in the very language in which he requested it: "If you find and believe from the evidence that the defendant, Thomas Waters, killed Phil Milam at the time and place alleged in the indictment, but you further believe that prior thereto said Phil Milam had made threats against the defendant to do him serious bodily harm or injury, and that at the time of the killing said Milam by some act then done manifested an intention to execute the threats so made, or do the defendant some serious bodily injury, or you believe that at the time of the killing said Milam had made or was making an unlawful attack upon the defendant, or had done, or was doing some act or acts which produced in the defendant's mind, as viewed from his standpoint, a reasonable apprehension of assault or death or serious bodily injury at the hands of Milam, and that he killed said Milam to protect himself from such danger, or apparent danger, then said killing was justifiable in self-defense, and

if you so find or have reasonable doubt as to whether said killing was justifiable in self-defense you will find the defendant not guilty."

These charges submitted every issue raised by the testimony as to appellant's claimed self-defense. No others should have been given.

The judgment should be, and is, ordered affirmed.

*Affirmed.*

ON REHEARING.

February 20, 1917.

DAVIDSON, Presiding Judge.—Deceased and appellant had been friends personally and in business relations. Some time, however, prior to the homicide there came a difference between them, minor at first, but more acute and of more magnitude as matters progressed. Deceased was rather aggressive in his hostility to appellant, engaging him at least once in a personal encounter, followed by threats of violence. These threats, or some of them, were communicated to appellant. This caused appellant to avoid contact with deceased, and he would evade or turn away when the prospect of meeting him occurred. The reputation of both parties was placed in evidence; that of deceased as being a quarrelsome and violent man and one who would execute any threat he might make; that of appellant was good in these different respects. On one occasion appellant had a difficulty with deceased while out driving in his auto. This occurred in the pasture of the deceased, the details of which are unnecessary to mention, but it may be stated that appellant received rather a severe chastisement at the hands of deceased. Deceased and a son of appellant had a difficulty at the church on the night previous to the homicide just as the congregation was separating. In this difficulty the son of appellant sustained a fracture in his arm. This was communicated to appellant by his son that night, and the following morning while en route to his bank he purposed, as usual, to go by the postoffice to get his mail. As he approached the postoffice he saw deceased at or near the place and proceeded to turn away, and went to a different part of the town and stopped. Both parties came to town in their autos. Appellant stopped his auto near the pool hall, which was also near a garage. There was a vacant space between the two buildings. Appellant and the witness Beck entered this vacant place, going some distance into it back from the street, and engaged in a conversation in which Beck informed appellant of the difficulty and its details between deceased and appellant's son on the night previous at the church. While thus engaged deceased passed the open space walking along the sidewalk, and after passing he returned and came in between the buildings where appellant and Beck were. Some words passed between deceased and appellant, and deceased left. Immediately Beck and appellant went out onto the street or sidewalk, and the shooting occurred.

The State's contention is that the facts and circumstances show or tend to show that deceased upon coming out from the vacant space,

walked towards the pool hall door, and as he was about to open and enter this door appellant shot him three times. There is a sharp difference as to the position of the parties and the acts and circumstances at this juncture. Illustrative of the State's version a witness testified that deceased went into the space between the two buildings, and further testified: "It was only a little while after that until Milam came out of there walking rather fast and went to the pool hall door. He was looking back over his shoulder from the direction whence he came. He got to the pool hall door. At that time Mr. Waters came around the north corner of the pool hall, and when he came around there he shot twice. There were three shots fired—two when he came around. Mr. Milam was standing right at the door at the time the two shots were fired trying to open one or the other. He was trying to open with one hand or the other the pool hall door when the first shot was fired. When the second shot was fired he whirled facing Waters. I couldn't say which hand Milam was trying to open the door with. I was watching both men, but he was trying to open the door when the first shot was fired. There was a screen to that door. After two shots were fired Milam fell, and Waters took two steps forward and shot again and walked away. When Mr. Waters fired the third shot, Mr. Milam was kinder resting on his shoulder. I don't know as he was clear down, but resting on one shoulder."

Appellant's contention was that deceased, after emerging from the vacant space, walked along the front street beyond the pool hall door, and as appellant emerged from the vacant space onto the street deceased was coming back facing him, and they met at or near the door of the pool hall, and the shooting occurred. His evidence is that deceased came to where he and Beck were talking and had been for about fifteen or twenty minutes; that Beck was narrating the incidents and circumstances of the difficulty on the previous night between appellant's son and the deceased, and that while so engaged deceased entered the vacant space and advanced to within about ten feet of them; that deceased appeared excited and angry; that appellant jumped up from his sitting position, drew his pistol and said to deceased, "Milam, don't come in here." That Beck about the same time told Milam to get out; that Milam stepped out and disappeared around the corner of the building, and there is evidence that deceased had his hand behind him at the time he approached appellant. Appellant, thinking he was in a trap, walked to the edge of the sidewalk with his pistol in his hand. Upon reaching the sidewalk he saw deceased coming towards him in a threatening attitude, looking excited, with his right hand behind him. At that time deceased was in front of or near the door of the pool hall. Just at this juncture appellant says, "I pulled my pistol and shot three times just as fast as I could pull the trigger of an automatic pistol."

Beck testified as to the location of the men, and that he and appellant were between the buildings in the vacant space and the deceased

passed this space and then turned and came in towards them; that the
appearance of deceased indicated "a scary and vicious look"; that he
called appellant's name, who said, "Phil, don't come in here. By God,
don't come in here." Witness says, "I pushed Waters and pushed Phil
and told him to get out, run or something. There were words being
said between them that I didn't catch." His evidence as to the exit
of deceased and the movement of appellant then and up to the shooting
is practically as that given by appellant in his testimony. Continuing,
this witness testified: "When I got out to the street, the first time I
saw Mr. Milam he was turning round coming back this way, in the
act of turning. He had been going in a southern direction, and he
came back towards where I was. I can't state his looks. He was
coming towards us and looking, you might say, a vicious, scary look,
wild. He was looking toward the north. Mr. Waters was there. It
was done so quick you could hardly tell where he was looking. I knew
he was looking at Waters, though. I believe his right hand was behind
him somewhere. I don't know what time he placed it there. I can't
tell in just what attitude he was coming. I heard the shots. When
the first shot was fired Milam was right in front of the pool hall door.
He had advanced to about in front of the pool hall door. Mr. Waters
fired three shots at him in front of the pool hall door. He got to the
door—I don't know at what time—and his right hand was behind him.
He didn't advance very much because the shots were so quick a man
couldn't advance. I didn't have time to observe any change in the
deceased's attitude before the shooting. At the time the first shot was
fired I looked at both—just threw my glance—it was done so quick.
As well as I can say, the first shot took effect about the left nipple
and he kinder—I don't know what—then he grabbed the screen door,
but he turned around and kept gradually sinking. While the shooting
was going on, some time during the shooting, Milam grabbed the screen
door. He grabbed the screen door right along about the first shot.
After the first shot was fired, he kinder dwindled down."

After the retirement of the jury they disagreed as to the testimony
of Beck and wrote out interrogatories under the direction of the court
to be asked Beck. One of the interrogatories is as follows: "What
did you do when you saw the deceased, and from the deceased's attitude
what did you think he was about to do?" The bill of exceptions as
drawn by appellant's counsel states that the court stated in the pres-
ence of the jury that this matter was not testified to by the witness and
he would not permit that question to be answered. Appellant excepted,
claiming that the witness had testified on the subject covered by the
inquiry, and that if permitted to answer the question he would have
stated that his former testimony was that when he first arrived on the
street in the space between the buildings he saw deceased advancing
with his right hand behind him looking straight at the appellant in an
angry and threatening manner, and that he jumped east so as to get
out of the line of range between the defendant and the deceased, for

he believed that he was in danger as he expected the deceased to fire at any time. The court qualifies this bill, stating that he had had the entire proceedings transcribed by the stenographer and made a part of the bill, and reference to this stenographic report fails to disclose that the court made any statement to the jury to the effect that the subject inquired about had not been touched in the witness' testimony, and fails to disclose that the court refused to ask the quoted question propounded by the jury. All that it says is that several of the questions are new matter. "He didn't testify, and I can't ask about, those matters." This bill leaves the matter in rather a confused condition. If the witness testified as was expected he would as to the repetition of his former testimony, it was important and the jury should have heard it. The court could not decide this question. He was not asked to state what the witness had not sworn. The witness was asked, and it was the province of the witness, to state what his former testimony was. The court could only limit the examination or the answer of the witness to the question as to his former statements. The witness could not testify to new matter, and the court could not authorize such testimony, but the court could not inhibit the witness from repeating his testimony in reply to the query of the jury. The witness ought to have been permitted to state whether he so testified before, and if he did, then the jury was entitled to hear it. This much is said in regard to this matter. It may not occur upon another trial. It is not the province of the court to decide whether or not he did not nor what his reply was before.

It also appears from the testimony that Beck had only seen part of the difficulty which occurred at the church the night prior to the homicide between deceased and appellant's son. He saw the actual encounter and heard the words that immediately preceded it, all of which occurred after the meeting was dismissed or adjourned and the congregation was leaving. This witness, however, did not see anything that occurred before that time, or which may have been the inducing cause of the difficulty. He informed appellant as to the part of the difficulty which he witnessed, and appellant's son also related that part to him substantially as did Beck. The State introduced the widow of deceased, and she testified that before the meeting was dismissed she and her husband were sitting in church a bench or so in front of appellant's son. She stated that her husband nudged her and she looked around, and the young man "twiddled her and her husband by placing his right hand against his nose and wiggling his fingers at them." This part of the transaction was not communicated to appellant so far as the evidence discloses, and appellant insists that inasmuch as the transaction between the deceased and appellant's son only became material and admissible on the issue of motive and giving the jury knowledge of the information with reference to the subject which appellant had at the time of the homicide, and may have affected him in his action during the difficulty, or operated on his mind in regard to the difficulty which

resulted in the killing, and this being true, that part of the transaction not having been communicated to him, was irrelevant, and that inasmuch as the conduct of appellant's son detailed by Mrs. Milam was an insult calculated to arouse the resentment of the deceased, its introduction against the appellant was prejudicial to his case. In this matter we think appellant is correct. It could not have operated upon the mind of appellant unless he was aware of this movement on the part of his son, and it may have left a decided impression adversely to appellant upon the minds of the jury, when, as a matter of fact, it did not enter into the motives or control the actions of appellant with reference to the homicide. We think this was an important matter, and being unknown to appellant, was of such a nature as requires a reversal of the judgment.

Tony Nobles testified for the State that at the time of the homicide he was in the pool hall and saw the shooting and the position of the parties through one of the windows, and, substantially, that at the time the deceased was shot he was going south and approaching the pool hall door, and that about the time he reached the pool hall door the appellant shot him twice, and after deceased fell he was lying a little bit on his back and side with his right arm under him, and he raised up just a little and said, "Oh, don't, Mr. Waters, please don't shoot any more," and groaned. That after that Mr. Waters shot him again. That Mr. Milam was lying on his right shoulder or right side, and that appellant came within about eight or nine feet from Milam before he fired the last shot. While this witness was on the stand appellant laid a predicate to impeach him by asking him, in substance, if it was not a fact that he had proposed to the witness Eubanks that he would not testify but would leave the country if he was paid a sum of money. Nobles denied this, and appellant called Eubanks, whose testimony impeached that of Nobles. On cross-examination the prosecuting attorney asked Eubanks if he knew what Nobles had testified, and he said no, but that he had heard that he denied making the statement. Just here the trial judge took up the inquiry and reprimanded the witness for disobedience to the rule, which had been invoked. This reprimand was given and the questions asked by the judge while he, as described in the bill, was commanding, flushed, angry and threatening; and in response to the court's inquiry, the witness said that he believed Mr. Waters, the appellant, told him that the witness Nobles had denied it. The court retired the jury and conducted a further inquiry into the transaction relating to the violation of the rules of the court. So far as the record discloses, no inquiry was made of the appellant, but the inquiries were addressed to the witness Eubanks, and after some time had been spent in the investigation the jury was called back, and as they entered the courtroom the court in their hearing said: "Assess his fine at $25." All this occurred over objection of appellant.

This bill is not approved by the court, but was proved up by bystanders. The affidavits of two of the jurors were taken, stating that

as the jury returned to the courtroom in the custody of the officer, the court said in their hearing in a loud and commanding voice: "Assess his fine at $25"; that they did not know who the fine was against, but supposed it was against Eubanks and defendant Waters, and that in their deliberations the matter was discussed to some extent.

The court prepared himself a bill which, substantially, shows that when it developed that the witness Eubanks had conversed with someone about the testimony of Nobles, he stopped the examination and conferred with the parties about the disobedience to the rule of the court and learned from the witness that the party with whom he had conferred was the appellant; he then retired the jury and assessed a fine against the witness, and that while counsel for appellant was persisting in arguing against the ruling of the court, the jury was brought in, and as they were coming in the court announced again: "Assess the fine at $25." This bill as prepared by the court makes no reference to the manner of the court in the conduct of the proceedings. We are of opinion that the record discloses a state of facts which were not authorized by the procedure, and calculated to prejudice appellant's cause. The witness Eubanks had impeached Nobles, who had given damaging testimony against appellant. This was controverted by appellant and his witnesses. The impeachment was of great importance to appellant, and the proceedings were calculated to give the jury the impression that in the opinion of the court the witness and appellant had been guilty of a serious violation of the rules of the court instructing the witnesses not to talk to anyone, and this attitude of the court was calculated to induce the jury to discredit appellant's witness Eubanks. It was calculated also to injure appellant for disobedience of the court's order in regard to talking with witnesses under the rule. The court's conduct in this matter in the presence of the jury, we think, was not correct, and was an invasion of the appellant's right to have the judge refrain from any expression or conduct which was calculated to impress the jury to the disadvantage of appellant's cause, or to discredit his witness with the jury. This matter was fully discussed, and the authorities cited, in Scott v. State, 72 Texas Crim. Rep., 26. See, also, Deary v. State, 62 Texas Crim. Rep., 352; Drake v. State, 65 Texas Crim. Rep., 282, 143 S. W. Rep., 1157; McMahan v. State, 61 Texas Crim. Rep., 489, and quite a number of cases collated by Mr. Branch in his work on Criminal Law, section 363. We think this was of such grave importance that a reversal should be awarded. The matter should have been handled so the jury would not have been informed of what occurred.

The charge of the court is complained of in several respects. Speaking generally, the court's charge enunciated the principles fairly well, but still there is that about the charge which shows that it was given in rather a negative than an affirmative form with regard to the question of self-defense as presented in its various forms. The appellant asked a special charge somewhat inartistic, yet presented a serious question

in the case, which was not given by the court. This charge, in substance, was to the effect that appellant had the right to have the jury informed in the charge on self-defense that if he had the right to fire the first shot, then that right continued until the danger to his life had ceased as viewed from his standpoint of the difficulty. There was evidence by a number of witnesses in support of appellant's theory that when the shooting began and continued to its end, that deceased had his right hand behind him in a manner calculated to impress appellant, in connection with the character of deceased, his animosity towards him, his threats and previous conduct, that he was about to draw a weapon to kill or injure him. Appellant's testimony, and that of his witnesses, was to the effect that the three shots were fired in rapid succession. The State's witnesses assert that two of the shots were fired in rapid succession, and that one of them was fired after an interval during which the deceased had fallen to the sidewalk. In this state of the case we are of opinion that appellant was entitled to a charge embodying the principles of law above mentioned, and in support of this view of the case we cite Stanley v. State, 62 Texas Crim. Rep., 306, 137 S. W. Rep., 703, and Powers v. State, 69 Texas Crim. Rep., 214, 494, 152 S. W. Rep., 909, to the effect that while it was somewhat inaccurate, it was sufficient to require the court to submit in an accurate form the proposition of law involved, and under the authorities of Clark v. State, 56 Texas Crim. Rep., 293; Smith v. State, 57 Texas Crim. Rep., 455; Jones v. State, 44 Texas Crim. Rep., 405, 71 S. W. Rep., 962; Sargent v. State, 35 S. W. Rep., 364; Drake v. State, 65 Texas Crim. Rep., 282, 143 S. W. Rep., 433, and Woodward v. State, 54 Texas Crim. Rep., 86, we are of opinion the trial court was in error in failing to give this phase of the law.

There is another proposition that might be mentioned so that if it occurs upon another trial there may be no error in regard to the admission of the testimony. The question came as to whether or not deceased was in the habit of carrying his pistol in his auto. The rule may be accurately stated, while there has been no qualification by the court in the opinions that where appellant knew deceased carried a pistol and exhibited it, it was admissible, and that where he knew or was aware of the fact he was in the habit of carrying a pistol, this would be admissible in a case of apparent danger, where the facts indicated that deceased placed his hand to where he would be expected to have a pistol. While the record is not as clear as it might be, yet if upon another trial appellant offers this character of testimony, and it shows or tends to show his knowledge of the fact that deceased carried a pistol, either in his auto or about his person, under the circumstances of this case we think this testimony ought to go to the jury. The fact that he knew he carried a pistol, or was in the habit of carrying it, brings the matter directly to his notice. That he was in the habit of carrying a pistol, or such was his reputation, appellant might prove. The object of proving general reputation in matters of this sort is to convey notice

to the party to be affected by reason of the general reputation, as it is the general reputation, it is, therefore, supposed that everybody knew the fact as an inference from such general reputation. Of course, if he knew it he had a right to prove it if it become a material matter or of any service to him in his defense. Knowledge on the part of the accused of the fact is the purpose of all this sort of testimony. How he obtained that knowledge would seem not to be of such a material character. If he was aware of it prior to the homicide and his knowledge of that entered into the trial of his case, or induced him to act as he did, it would be a relevant fact for the jury to consider. It may have been a patent reason for his action in shooting. This is so with reference to all this character of testimony, whether it refers to the carrying of arms by deceased and appellant's knowledge of it, or whether he knew it directly. The same rule covers the question of threats. If appellant knew the threats he could act and would be supposed to have that in view, at least it would be a relevant fact for the jury, or being informed that deceased had made the threats and believed it, he could still act, that is in a case where apparent danger arises from some demonstration or overt act on the part of the deceased to execute his threats. We call attention to this so that upon another trial if this matter comes in such shape as to bring notice to appellant, or probably did, the evidence should be admitted. In this particular case the relevancy of the testimony might be apparent, because on the morning of the trouble, and just preceding it, which was the morning following the trouble in which deceased had broken the arm of appellant's son by throwing some wire nippers or a monkey wrench at him, and the fact that deceased had gone to the postoffice, realizing the habit and custom of appellant to go to the postoffice in the morning to get his mail, and there had taken his stand and was waiting for him, as it may have appeared, and the facts indicate it could have appeared, to appellant, and then following him almost immediately into the vacant space under the conditions and circumstances already stated, it might have left the impression upon the mind of appellant or induced him to believe that deceased had brought his pistol with him from the auto, especially in view of the fact when he entered the vacant space where appellant and Beck were he had his hand behind him, and when appellant confronted him on the street immediately afterwards he still had his hand behind him, and it was a fact or circumstance to consider as to whether or not he armed himself with a pistol from the auto. As a matter of fact, it seems to have been developed that after the shooting deceased did not have a pistol on his person, but he did have the wire nippers, etc., which it seems from the testimony he was in the habit of using on people whom he engaged in broils and fights. So upon another trial if appellant had notice of the fact or was informed that deceased was in the habit of carrying his pistol in his car, under the circumstances of this case that fact ought to go to the jury. That, of course, will develop upon another trial under the facts and circumstances.

As the case is presented we are of opinion the motion for rehearing should be granted, the affirmance set aside, and the judgment reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, Judge.—This cause, and every question raised in it, was, without doubt, correctly decided in the original opinion herein by the full court as then constituted. The motion for rehearing should be overruled. I dissent from the granting of said motion, and the reversal. The case should, under the law and facts, be affirmed, not reversed.